NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

REGINA HELENE BELSANTI, *Plaintiff/Appellant,*

*v.*

KUTAK ROCK, LLP, et al., *Defendants/Appellees.*

No. 1 CA-CV 25-0154

FILED 03-20-2026

Appeal from the Superior Court in Maricopa County
No. CV2023-006738
The Honorable Jennifer C. Ryan-Touhill, Judge

**VACATED AND REMANDED**

COUNSEL

Hovore Law PLLC, Scottsdale
By F. Thomas Hovore, Anne L. Thompson
*Co-Counsel for Plaintiff/Appellant*

Robert G. Schaffer PLC, Scottsdale
By Robert G. Schaffer
*Co-Counsel for Plaintiff/Appellant*

Stinson LLP, Phoenix
By Jeffrey J. Goulder, James Camoriano, Michael Vincent
*Counsel for Defendants/Appellees*

---

**MEMORANDUM DECISION**

Judge Michael S. Catlett delivered the decision of the Court, in which Presiding Judge D. Steven Williams and Judge Andrew M. Jacobs joined.

---

**C A T L E T T**, Judge:

¶1        Regina Belsanti ("Belsanti") appeals the superior court's grant of summary judgment in favor of Kutak Rock, LLP ("Kutak") and one of its former attorneys, Michael Sillyman ("Sillyman") (collectively, "Defendants"). The court concluded her claims are barred under the applicable statute of limitations, basing that decision partially on privileged communications the court ordered her to disclose.

¶2        Belsanti's legal malpractice and breach of fiduciary duty claims are based on advice—allegedly negligent—she claims Sillyman gave her in 2007 regarding a premarital agreement ("PMA") she then entered with her then-fiancé, now-ex-husband Gary McCracken ("McCracken").

¶3        Because the court erred in granting discovery about Belsanti's privileged communications with her prior divorce counsel, and because her claims did not accrue outside the limitations period, we vacate the judgment and remand for further proceedings.

**FACTS AND PROCEDURAL HISTORY**

¶4        We review a decision granting summary judgment for Defendants, so we describe the facts in the light most favorable to Belsanti, the non-moving party. *See Gipson v. Kasey*, 214 Ariz. 141, 142 ¶ 2 (2007).

¶5        Before marrying McCracken in March 2007, Belsanti retained Kutak and Sillyman, who advised her on the terms of the PMA, including how it would impact her marital community's interest in McCraken's dermatology practice. During the marriage, McCracken grew that practice from one office to nine—he then sold the practice in 2018 for millions of dollars. Those who purchased the practice required Belsanti to sign a spousal disclaimer of all ownership interest in the practice.

¶6        McCracken filed for divorce in May 2021. Belsanti retained Dickinson Wright ("Dickinson") to represent her in the divorce proceedings. During those proceedings, Belsanti contested the PMA's

2

validity. The superior court at first found the PMA unenforceable. But after McCracken moved for reconsideration, the court granted partial summary judgment for McCracken, concluding the PMA was enforceable. A little over a year later, Belsanti and McCracken settled their disputes, and the court entered a consent decree of dissolution. The decree categorized the entire medical practice as McCracken's separate property.

¶7 On May 2, 2023, Belsanti brought this legal malpractice and breach of fiduciary duty action against Defendants. She alleged Sillyman negligently advised her that the PMA's community property waiver applied only to the practice as it existed at the time the PMA was signed, and that she was not giving up any community interest in any expansion of the practice beyond the assets addressed in the PMA. Belsanti claimed damages "in excess of $15,000,000."

¶8 Belsanti alleged that only during the divorce proceedings did she become aware of the implications of the PMA—that it rendered all of McCracken's practice and the proceeds of its sale his separate property. Defendants, on the other hand, contended Belsanti knew of the PMA's effects prior to May 2, 2021—outside the two-year limitations period.

¶9 Seeking evidence that Belsanti's claim accrued earlier than May 2, 2021, Defendants sought privileged communications between Belsanti and Dickinson. Defendants argued these communications contained "critical information concerning the date on which Plaintiff knew or should have known of the facts giving rise to her present claims . . . which bears directly on Defendants' statute-of-limitations defense." They argued Belsanti "has put the timing of her knowledge of Dr. McCracken's PMA interpretation at issue" and thus "waived the privilege on that topic."

¶10 Belsanti objected to disclosure, arguing she did not affirmatively place the privilege at issue by filing a complaint. She argued Defendants were the ones putting her privileged communications at issue.

¶11 The court allowed Defendants to subpoena documents from Dickinson, including "[a]ll advice to and communication with Plaintiff regarding the validity, effect, or interpretation of the premarital agreement." The court reasoned that "because Plaintiff has argued that her interpretation of the law controls, she cannot, contemporaneously, argue that Defendants are precluded from obtaining evidence that may support their contrary interpretation."

¶12 Defendants then moved for summary judgment, arguing Belsanti's claims were time barred because they accrued more than two years before she filed them. Defendants argued Belsanti's claims accrued upon signing the PMA or upon marriage because that is when she suffered damages. Alternatively, they argued Belsanti "knew or should have known of the facts underlying her [claims] before May 2, 2021[.]" Defendants alleged Belsanti's financial advisor informed her of the possible implications of the PMA. They also maintained that communications between Belsanti and Dickinson demonstrated she "understood or should have understood before May 2, 2021 that the PMA negatively affected her rights to the medical practice sales proceeds."

¶13 Belsanti opposed summary judgment, arguing her claims were timely as a matter of law. But she argued that even if the court disagreed with that argument, there were genuine issues of material fact precluding summary judgment. As to the advice from her financial advisor, Belsanti argued his declaration was hearsay, it lacked facts showing she was put on notice, and it created fact questions because she testified that she did not recall discussing the PMA with him before the divorce. She also reiterated her objection to the Defendants' use of her privileged communications with Dickinson.

¶14 The court granted summary judgment for Defendants, finding Belsanti's claim accrued in 2007, contemporaneous with Sillyman's allegedly negligent representation. Alternatively, the court found multiple events outside the statute of limitations period put Belsanti on "notice of facts rising to alleged malpractice[.]" These included when "[t]he couple moved assets into trust during their marriage (well before the divorce) and in doing so affirmed the PMA," when the couple "met with their financial advisor in October 2020, and discussed the existence of the PMA and the possible effect to Plaintiff[,]" and when Belsanti had privileged discussions with Dickinson before May 2021. The court also concluded there were other instances when Belsanti "could have sought legal advice to ascertain how the PMA impacted [her] rights." These included when McCracken opened each subsequent dermatology office, when Belsanti attended a meeting with a trust attorney, and when McCracken sold his practice and Belsanti signed a disclaimer.

¶15 Belsanti timely appealed. We have jurisdiction. A.R.S. § 12-2101(A)(1).

4

**DISCUSSION**

**¶16** Belsanti argues the superior court erred by ordering production of privileged communications between her and Dickinson, that her malpractice claims did not accrue until after the divorce proceedings began, and that the superior court improperly resolved factual disputes and made credibility findings at the summary judgment stage.

## I. Privilege

**¶17** Belsanti argues the superior court erred in ordering production of privileged communications between her and Dickinson. We agree.

**¶18** We review de novo whether the attorney-client privilege exists and whether a party has waived that privilege. *State ex rel. Adel v. Adleman*, 252 Ariz. 356, 360 ¶ 10 (2022). The attorney-client privilege is codified in Arizona. *See* A.R.S. § 12-2234(A). And it has bedrock importance. *See McGlothlin v. Astrowsky*, 255 Ariz. 449, 456 ¶¶ 17–19 (App. 2023) (detailing the largely unchanged nature of the privilege over the past several hundred years and its policy justifications); *see also Hickman v. Taylor*, 329 U.S. 495, 512 (1947) (noting "the general policy against invading the privacy of an attorney's course of preparation is so well recognized and . . . essential to an orderly working of our system of legal procedure").

**¶19** The first question we address is whether Belsanti "has satisfied 'the burden of making a prima facie showing that the privilege applies to a specific communication.'" *McGlothlin*, 255 Ariz. at 457 ¶ 22 (quoting *Clements v. Bernini*, 249 Ariz. 434, 439–40 ¶ 8 (2020)). The parties and the superior court seemed to agree that an attorney-client relationship existed between Belsanti and Dickinson and that the communications Defendants sought contained confidential legal advice. Because the issue was not developed in the joint statement of discovery dispute or related motions, and because the parties and the court focused only on waiver, we assume the communications are privileged. That leaves only the question whether Belsanti impliedly waived the attorney-client privilege. *See McGlothlin*, 255 Ariz. at 460 ¶ 37.

**¶20** A party seeking privileged communications must "prov[e] waiver or demonstrat[e] a good faith basis for an exception." *Adleman*, 252 Ariz. at 362 ¶ 21. Mere relevance and materiality do not suffice. *State Farm Mut. Auto. Ins. Co. v. Lee*, 199 Ariz. 52, 58 ¶ 15 (2000) ("[T]here is more than relevance and materiality needed to find waiver, for communications with counsel are almost always very relevant and material.").

¶21 Arizona has adopted the *Hearn* test, which applies three criteria for finding implied waiver of the attorney-client privilege. *See id.* at 56–57 ¶¶ 10–11; *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975). The three criteria are as follows:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, . . . by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Lee*, 199 Ariz. at 56 ¶ 10.

¶22 Applying the three *Hearn* criteria, Belsanti did not impliedly waive the attorney-client privilege. *See id.*; *Hearn*, 68 F.R.D. at 581. First, Belsanti has not asserted the privilege through an affirmative act. To waive the privilege, a litigant "must affirmatively 'interject the issue of advice of counsel into the litigation.'" *Empire W. Title Agency, L.L.C. v. Talamante ex rel. Cnty. of Maricopa*, 234 Ariz. 497, 499 ¶ 10 (2014) (quoting *Lee*, 199 Ariz. at 62 ¶ 28) (cleaned up). Filing an action alone is not enough. *Id.*

¶23 In *McGlothlin*, after finding the plaintiff did not affirmatively interject advice of counsel—he merely accused the defendant of malpractice—we concluded he had not waived the privilege. 255 Ariz. at 461 ¶ 41, 463 ¶ 47. Instead, it was the defendant who raised issues implicating plaintiff's privileged communications to avoid or reduce liability. *Id.* at 462 ¶ 43. But the defendant could not "use her defenses—even if [plaintiff's] claim is a 'catalyst' for those defenses—as a reason to set [plaintiff's] attorney-client privilege aside." *Id.* (quoting *Robert W. Baird & Co. v. Whitten*, 244 Ariz. 121, 126 ¶ 12 (App. 2017)).

¶24 In contrast, both *Hearn* and *Lee* involved defendants who asserted defenses relying on their subjective knowledge based on legal advice they received. Put another way, they used privilege as a "sword and shield" by defending based on legal advice and then seeking to shield that same legal advice from discovery.

¶25 Belsanti did not affirmatively put privileged communications at issue by "merely filing an action" for legal malpractice. *See Empire W. Title Agency*, 234 Ariz. at 499 ¶ 10. Her complaint alleges facts related to Sillyman's 2007 representation, and how that representation caused her harm. Her claims do not "necessarily include[ ] the information received from [her later divorce] counsel." *See Lee*, 199 Ariz. at 62 ¶ 28. Her

complaint did not rely on any advice she received from Dickinson or any facts, theories, or legal interpretation related to communications with Dickinson. It is Defendants who interjected the issue of Belsanti's communications with Dickinson. But Defendants cannot use their own affirmative defenses (like the statute of limitations) to pierce Belsanti's attorney-client privilege. *See McGlothlin*, 255 Ariz. at 462 ¶ 43.

¶26            Defendants argue Belsanti "affirmatively injected the limitations issue into the case in several ways." In so doing, Defendants conflate Belsanti putting at issue "the timing of her knowledge of the PMA's terms" with affirmatively interjecting advice of counsel. Defendants do not argue—as is required for waiver—that Belsanti interjected advice of counsel or a subjective interpretation of law. Belsanti did not argue, for example, that her claims were timely because Dickinson did not advise her to sue sooner. *See id.* at 462-63 ¶ 46. And because she did not make any similar argument, Belsanti did not waive the attorney-client privilege.

¶27            For its part, the superior court concluded Belsanti waived the privilege when she "argued her interpretation of the law controls," while also arguing "that Defendants are precluded from obtaining evidence that may support their contrary interpretation." But Belsanti never interjected Dickinson's advice. She did not rely on its advice to bolster her claims. She did not use privileged communications between her and Dickinson as a sword against Defendants. She merely used the privilege as a shield to protect herself from having to produce confidential legal advice based on issues Defendants raised through a statute of limitations defense.

¶28            Defendants also have not satisfied *Hearn*'s second and third criteria. *See Lee*, 199 Ariz. at 56 ¶ 10; *Hearn*, 68 F.R.D. at 581. Belsanti did not put privileged information at issue by making it relevant to the case. The superior court thought that because Belsanti "has made issue of Defendant Sillyman's legal advice, and because Defendant Sillyman seeks to defend himself (and the law firm) through, in part, a statute of limitations defense, [Belsanti's] discussions with [Dickinson] are relevant and not privileged." This misapplies implied waiver. Putting Sillyman's legal advice at issue is not the same as putting Dickinson's legal advice at issue— the latter was required to waive the privilege. Again, it was Defendants who made Belsanti's privileged communications relevant by advancing a statute of limitations defense and hoping privileged communications support it.

¶29            Applying the privilege also will not deny Defendants access to information vital to their defense. True, applying the privilege may

deprive them of documents helpful to their defense, but that is the nature of the privilege. *See Robert W. Baird & Co.*, 244 Ariz. at 128 ¶ 22. Defendants have alternative avenues they can pursue (and have pursued) to prove Belsanti's claims accrued outside the statute of limitations, such as seeking discovery about non-privileged material. In fact, Defendants argue they were entitled to summary judgment even without the privileged documents from Dickinson.

**¶30** Because Belsanti did not impliedly waive the attorney-client privilege with Dickinson, the court erred by allowing Defendants to use those communications to support summary judgment. On remand, unless and until Belsanti *affirmatively* interjects advice from Dickinson into this litigation, her communications with that law firm cannot be used as evidence.

## II. Accrual

**¶31** Belsanti argues her claims did not accrue until her divorce was final, or alternatively, that disputed facts material to accrual precluded summary judgment. We review de novo the entry of summary judgment, viewing the evidence and reasonable inferences in the light most favorable to the non-moving party (Belsanti). *Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12 (2003). Summary judgment is appropriate when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a).

### A. Accrual Standard

**¶32** The statute of limitations for legal malpractice and breach of fiduciary duty is "two years after the cause of action accrues." A.R.S. § 12-542; *Keonjian v. Olcott*, 216 Ariz. 563, 565 ¶ 9 (App. 2007). "But the[ ] statutes of limitation do not purport to define when a cause of action 'accrues.'" *Glaze v. Larsen*, 207 Ariz. 26, 29 ¶ 9 (2004). "Rather . . . that analysis has been left to judicial decision." *Id.*

**¶33** A legal malpractice claim accrues when a claimant "discovers the negligence and sustains ascertainable harm as a result of that negligence." *Com. Union Ins. Co. v. Lewis and Roca*, 183 Ariz. 250, 256 (App. 1995). This is known as the discovery rule. *See id.* at 254; *Keonjian*, 216 Ariz. at 565 ¶ 9.

**¶34** When malpractice occurs during litigation, the statute of limitations does not accrue "until the appellate process is completed or is waived by a failure to appeal." *Amfac Distrib. Corp. v. Miller*, 138 Ariz. 152,

154 (1983). This is because "[w]hile the underlying civil case is still pending on appeal, the possibility always exists that the malpractice plaintiff will eventually prevail in the civil litigation," thereby avoiding harm from the malpractice. *Glaze*, 207 Ariz. at 30 ¶ 15.

¶35 When malpractice occurs outside litigation (e.g., while drafting a legal instrument), the statute of limitations does not run until a plaintiff has suffered harm and knows or should have known that the harm was a direct result of the attorney's negligence. *Com. Union*, 183 Ariz. at 252–53. In other words, the discovery rule applies to all elements of a legal malpractice claim—negligence, causation, and damages. *Id.* at 253.

¶36 Usually in the non-litigation context, "the damage or injury occurs contemporaneously with the malpractice." *Id.* at 256. This is true when immediate harm is "irremediable or irrevocable[.]" *Keonjian*, 216 Ariz. at 566 ¶ 13. Occasionally, however, the harm is not irremediable or irrevocable because "a future appeal or other court proceedings" might enable the client to "avoid[]" harm. *Glaze*, 207 Ariz. at 30 ¶ 15 n.1. In that situation, "the harm or damage resulting from the attorney's negligence [is] speculative and uncertain when the malpractice occur[s]," so the malpractice claim does "not accrue until later." *Com. Union*, 183 Ariz. at 255.

¶37 For the statute of limitations to run, mere harm is insufficient. The client must also appreciate that harm has occurred and who caused it. *Id.* at 256. So when an attorney's advice constitutes "actionable negligence, that is, malpractice in which the negligent act cause[s] immediate, appreciable damage," the statute of limitations begins to run. *Id.* On the other hand, when "no appreciable, non-speculative harm or injury immediately flow[s] from the negligent advice," the statute does not run until appreciable, non-speculative harm or injury occurs. *Id.* Put differently, cognizable "'injury' is not the mere undetected existence of either a problem created by negligent legal advice or the continuance of the problem." *Id.* And "[t]he threat of future harm from [malpractice is] not sufficient to commence the limitations period." *Id.*

## B. Application

¶38 To be timely, Belsanti's causes of action had to accrue on or after May 2, 2021—two years before she filed her complaint. *See* A.R.S. § 12-542; *Keonjian*, 216 Ariz. at 565 ¶ 9. If her claims accrued as a matter of law before that date, the statute of limitations bars her suit and summary judgment was appropriate. *See Keonjian*, 216 Ariz. at 566 ¶ 16. We conclude Belsanti's claims did not accrue before May 2, 2021.

¶39         Belsanti's claims arise in a non-litigation context—advice about the PMA. The superior court concluded Belsanti's claims accrued in 2007, "when she received legal advice from [ ] Sillyman regarding the PMA." We think otherwise. There is no evidence Belsanti knew or should have known that Defendants rendered deficient legal advice in 2007. There is also no evidence that the PMA caused Belsanti any irremediable or irrevocable harm in 2007 or that she knew it had done so. At most, Defendants' alleged malpractice created a problem for Belsanti, which would not ripen into harm until future events unfolded.

¶40         When did those future events unfold? The controlling issue is when Belsanti became aware or should have become aware that she suffered irrevocable harm as a result of Defendants' alleged malpractice. *See id.* We conclude that occurred, at the earliest, during the divorce proceedings between McCracken and Belsanti.

¶41         Belsanti claims Defendants gave erroneous legal advice about the PMA in 2007. She alleges Defendants advised her regarding the PMA's community property waiver, particularly with respect to how it would operate in the event of a sale of McCracken's expanded medical practice and a subsequent divorce. She contends Defendants advised that everything during marriage would be community property, despite the PMA saying that McCracken's then-existing medical practice would remain his separate property. For example, Belsanti executed a declaration stating that "[a]t no time during the meeting, or after, did Sillyman advise me that, pursuant to the terms of the PMA, *upon dissolution of the marriage*, [McCracken] would be entitled to nearly all of the assets acquired during the marriage." (Emphasis added).

¶42         So Belsanti's claims center on advice about what would happen to property in the event of dissolution. That advice, therefore, was not implicated until Belsanti or McCracken petitioned to dissolve their marriage. McCracken first served Belsanti with a petition to dissolve their marriage on May 19, 2021. Because that date falls after the May 2, 2021, cutoff for accrual, Belsanti's claims are timely unless the divorce proceedings are irrelevant to accrual. We conclude they are relevant. Before McCracken petitioned for divorce, Belsanti could not know she would ever suffer harm as a direct result of Defendants' advice about how property would be treated under the PMA *upon dissolution of the marriage*.

¶43         But even after McCracken petitioned for divorce, Belsanti could not have known that Defendants' advice was the actual cause of any harm because McCracken did not immediately move to enforce the PMA.

That occurred in August 2021, when McCracken moved for summary judgment. Only after McCracken did so and took the position that under the PMA all assets traceable to his medical practice were his sole and separate property could Belsanti have some idea that Defendants' advice might have caused her harm.

¶44            Even then, any harm from Defendants' advice was not yet irremediable or irrevocable because future court proceedings could have enabled Belsanti to avoid harm. *See Glaze*, 207 Ariz. at 30 ¶ 15 n.1; *Com. Union*, 183 Ariz. at 255-56; *CDT, Inc. v. Addison, Roberts & Ludwig, C.P.A., P.C.*, 198 Ariz. 178-79 ¶¶ 20-21 (App. 2000). Specifically, Belsanti challenged the enforceability of the PMA, and had she succeeded, it would have alleviated any harm from Defendants' advice. At first, the superior court agreed with Belsanti and concluded the PMA was unenforceable. But Belsanti's victory was short-lived. McCracken moved for reconsideration, which the court granted on June 3, 2022.

¶45            After the court concluded the PMA was enforceable, Belsanti still had one more avenue for avoiding harm—she could argue that the court should interpret the PMA consistent with her understanding. In her response to McCracken's motion for partial summary judgment on the PMA's enforceability, Belsanti reserved her argument about how the PMA should be interpreted. Instead of continuing to fight, however, Belsanti entered into a settlement agreement with McCracken, under which McCracken's interest in the medical practice would be his sole and separate property. The parties notified the court of the settlement on July 31, 2023, and the court entered a consent decree of dissolution on September 20, 2023.

¶46            Because the divorce proceedings were relevant to accrual, Belsanti's claims could not have accrued any earlier than May 19, 2021, when McCracken served her with divorce papers. And because May 19, 2021, occurred within two years of Belsanti filing her claims in this lawsuit, those claims were timely.

¶47            The superior court concluded *Keonjian* governs here, and Defendants urge the same on appeal. But this case is not like *Keonjian*. There, the plaintiff suffered harm immediately upon signing a negligently drafted property deed and gift letter. *Keonjian*, 216 Ariz. at 566 ¶ 13. The deed immediately deprived her of property rights and the letter immediately deprived her of any right to reimbursement over $300,000. *Id.* Moreover, her harm was "irremediable or irrevocable . . . because 'a future appeal or other court proceedings' would not have enabled her to [remedy the harm]." *Id.* (quoting *Glaze*, 207 Ariz. at 30 ¶ 15 n.1). Finally, the plaintiff

11

admitted in a deposition that occurred more than two years before bringing her malpractice action that she knew her lawyer was to blame for her harm. *Id.* at ¶ 15 ("My lawyer is supposed to tell me: Stop, it's not what you want to be done. But I thought he knew better. He's a lawyer.").

**¶48**        Defendants also point to several other events that occurred before Belsanti's divorce proceedings and argue those events triggered accrual. We disagree they did so.

**¶49**        First, Defendants point to privileged communications and deposition testimony about privileged information as evidence Belsanti had actual knowledge of the PMA's consequences before May 2021. As explained, the superior court should not have found implied waiver of the attorney-client privilege and allowed Defendants to use privileged information as evidence. *Supra* ¶¶ 17–30. So we will not consider any privileged information in deciding whether Belsanti's claims were timely.

**¶50**        Second, Defendants maintain that, shortly before the divorce proceedings, Belsanti's wealth manager put her on actual notice that the PMA could negatively affect her rights. Defendants submitted a declaration from this wealth manager. In it, he explains that in April 2021, Belsanti presented him with a list of assets and asked, "what her rights would be in those assets upon [] divorce." He says he told Belsanti "that she may have no interest in the assets listed, *depending on the provisions of the PMA*." That a wealth manager told Belsanti that she "may" not have an interest in certain assets "depending on the provisions of the PMA" is insufficient to show that Belsanti should have known that Defendants had directly caused her irremediable and irrevocable harm with their advice about the PMA. *See Com. Union*, 183 Ariz. at 252–53; *Glaze*, 207 Ariz. at 30 ¶ 15 n.1.

**¶51**        Third, Defendants rely on a declaration Belsanti executed during the divorce proceedings describing a meeting she and McCracken had with a trust attorney in 2017. The declaration is not in the superior court record, but Defendants ask us to take judicial notice of it. We will not do so. *See Scottsdale Mem'l Health Sys. v. Clark*, 157 Ariz. 461, 468 (1988) ("Arizona courts may not take 'judicial notice' of the *truth* of an evidentiary record in another action tried in the same court."). In any event, it is difficult to see how it helps Defendants' position that Belsanti claimed in the declaration that she and McCracken were told that a trust they formed "acted to abolish [the PMA] as to the assets placed in the trust" and that it was unnecessary to modify the PMA because the trust "would supersede any prior agreement and the [PMA] would be of no effect."

¶52 Fourth, Defendants point to McCracken's 2018 sale of the dermatology practice and the accompanying spousal disclaimer Belsanti signed. In that disclaimer, Belsanti acknowledged that McCracken had a membership interest in a company called Center For Dermatology, PLLC and that his membership interest "has at all times in the past been, is now and will in the future remain [his] sole and separate property[.]" She also acknowledged that the membership interest "may be increased in the future through a capital contribution of sole and separate property" and that she had no right to the membership interest or "to any profits, gains, [or] income . . . now or hereafter received[.]" And she disclaimed any community property interest only "in any compensation received by my spouse from the [c]ompany for personal services rendered[.]"

¶53 The spousal disclaimer cannot bear the weight Defendants place on it. That Belsanti acknowledged both that McCracken had a sole and separate ownership interest in the company and that she had no right to current or future profits or any community property interest in McCracken's compensation does not reveal what impact the PMA would have in future divorce proceedings. For example, even with Belsanti disclaiming any formal ownership interest in certain sole and separate property, in later divorce proceedings, the marital community could ordinarily claim an equitable apportionment of any increase in the value of that property. *See Cockrill v. Cockrill*, 124 Ariz. 50, 52 (1979); *Honnas v. Honnas*, 133 Ariz. 39, 40 (1982). Whether the PMA would prevent the community from doing so remained unknown until McCracken sought to dissolve the marriage and enforce the PMA.

¶54 Lastly, Defendants argue Belsanti was generally on notice to investigate how the PMA treated each additional dermatology office McCracken opened during the marriage. The superior court wrote that "[n]othing prevented [Belsanti] from seeking to modify the PMA and/or clarify whether the additional offices would be separate or community property once [she] and Dr. McCracken began expanding the medical practice." But the pertinent question is not whether Belsanti could have taken additional steps to minimize harm from the PMA. The relevant question is this: when should Belsanti have known that Defendants' advice about how the PMA would impact future divorce proceedings had directly caused her irremediable and irrevocable harm? *Com. Union*, 183 Ariz. at 252–53; *Glaze*, 207 Ariz. at 30 ¶ 15 n.1. As explained, that occurred no earlier than when McCracken petitioned for dissolution and began enforcing the PMA in a manner inconsistent with Defendants' alleged advice.

¶55   Because Belsanti filed her claims within two years of them accruing, those claims were timely.

## III. Estoppel

¶56   We agree with the superior court that summary judgment for Defendants was not required because "the family court found that [Belsanti] failed to show she had inadequate representation at the time she entered the PMA[.]" The court was correct that a "cursory finding regarding competency" does not "equate[ ] to lack of malpractice."

## IV. Waiver

¶57   Defendants argue that by affirming in the 2018 disclaimer that "she would not claim property rights in the medical practice in the future[,]" Belsanti "cannot maintain an action for damages arising out of the value of that property interest." Defendants conflate property rights in a medical practice with both (1) equitable rights a marital community may have in the increased value of sole and separate assets and (2) the right to seek tort damages for unrelated negligence.

¶58   We therefore disagree with the superior court that the 2018 disclaimer "forfeited any potential damages due to Defendant Sillyman's alleged negligence and, regardless of the outcome of the divorce, the (negligence) damages no longer existed." Nothing in the disclaimer related to waiver of tort claims against Defendants, nor were they parties (or third-party beneficiaries) to the 2018 disclaimer. And while the 2018 disclaimer may be relevant to Belsanti's malpractice claims, we disagree that it "shows that [Belsanti] understood and agreed to the terms of the PMA, which then means Defendant Sillyman was not negligent[.]" By signing the 2018 disclaimer, Belsanti did not waive any right to sue Defendants for professional malpractice and breach of fiduciary duty arising out of negligent advice about how the PMA would impact the marital community in future dissolution proceedings.

## CONCLUSION

¶**59**       We vacate the judgment and remand for proceedings consistent with this decision.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:          JR